**Brian Keith JEFFCOAT, Appellant,**

v.

**Otis BOWEN, Secretary of Health & Human Services, Appellee.**

**No. 87–1073.**

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 9, 1987.

Decided Feb. 29, 1988.

Timothy C. Harlan, Columbia, Mo., for appellant.

E. Eugene Harrison, Kansas City, Mo., for appellee.

Before McMILLIAN, ARNOLD and BOWMAN, Circuit Judges.

McMILLIAN, Circuit Judge.

Brian Keith Jeffcoat appeals from a final judgment entered in the District Court for the Western District of Missouri granting summary judgment in favor of the Secretary of Health and Human Services (hereinafter the Secretary). *Jeffcoat v. Bowen,* No. 85–4067–CV–C–5 (W.D.Mo. Nov. 19, 1986). For reversal Jeffcoat argues that the Secretary's decision that he is not disabled is not supported by substantial evidence on the record. We agree and reverse the judgment of the district court and remand with directions to award benefits.

Jeffcoat filed an application for Supplemental Security Income Disability benefits on August 12, 1983, on the basis of a

severe hearing loss and a learning disability. At the time he was 18 years old and a senior in high school. Jeffcoat's application was denied at the initial stage and again on reconsideration. Following a hearing, an administrative law judge (ALJ) concluded that Jeffcoat was not disabled and was able to perform several jobs that were available in large numbers in the national economy. The appeals council affirmed the ALJ's decision and Jeffcoat appealed to the district court.

The district court granted Jeffcoat's motion for summary judgment because a hypothetical question submitted to the vocational expert did not set forth all of Jeffcoat's impairments.[1] The district court remanded the case to the Secretary for further proceedings.

Following a second hearing in November 1985, the ALJ again found that Jeffcoat was not disabled. The appeals council accepted the ALJ's decision, and Jeffcoat again appealed to the district court. The district court concluded that the Secretary's decision that Jeffcoat was not disabled was supported by substantial evidence on the record and granted the Secretary's motion for summary judgment. At 8. The district court denied Jeffcoat's motion for summary judgment. *Id.* This appeal followed.

This court must sustain the Secretary's determination that an applicant is not disabled if that decision is supported by substantial evidence on the record as a whole. *E.g., Alexander v. Weinberger,* 536 F.2d 779, 784 (8th Cir.1976). Substantial evidence is defined as such evidence that a reasonable person might accept as adequate to support a conclusion. *E.g., Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *McMillian v. Schweiker,* 697 F.2d 215, 220 (8th Cir.1983).

**Medical Evidence**

The undisputed medical evidence established that Jeffcoat was born with a moderately severe, bilateral sensori-neural hear-

---

**1.** The hypothetical question failed to include the uncontradicted evidence of Jeffcoat's expert witness, Donna Haley, that Jeffcoat would require three to four years of continued therapy and schooling to acquire the skills necessary to secure and maintain competitive employment.

ing loss. An audiological test administered in August 1983 revealed borderline severe, sensori-neural hearing impairment of the right ear and a moderate sensori-neural hearing impairment of the left ear. With a proper hearing aid and proper background noise conditions, Jeffcoat's speech reception threshold is 85% of normal conversational speech levels.

Jeffcoat's hearing loss was not diagnosed until he was about nine years old, although he began to experience difficulty when he was approximately four years old. In January 1969 a psychiatrist diagnosed him as "borderline record compatible with the clinical history of brain damage implicating principally the left temporal region" and suggested that he was hallucinating. Jeffcoat has been given a number of intelligence (IQ) tests. On a Wechsler Intelligence Scale for Children test administered in November 1977, Jeffcoat attained a full scale IQ of 80. In September 1983, on an updated test of the same type, Jeffcoat obtained a full scale IQ score of 93.

Donna Haley, a clinical instructor at the University of Missouri Medical Center, Department of Psychiatry, testified as an expert witness on behalf of Jeffcoat. Haley had worked with both adults and children with learning disabilities. In response to a hypothetical question, she stated that a person with a severe hearing loss that is not diagnosed in the first five years of life would have permanent deficiencies in language development. Even if the hearing loss was later completely corrected, the language deficiency would never be completely corrected: vocabulary would be limited, language structure impaired, language comprehension low, sentence structure restricted, and reading ability retarded. Haley also testified that hearing-impaired people quite often have learning disabilities. She found that Jeffcoat exhibited some of the symptoms of the learning disabled: problems with time and space, sequencing of acts, inability to pay attention, and high distractability. She believed that these problems could not be solved by simply working with a speech pathologist or by attending college. Instead, Jeffcoat would require a special technical-vocational training program. Haley believed that

Jeffcoat would be employable in three to four years if these special technical-vocational services were provided.

Dr. Joe Ray, a child psychologist, issued a report dated April 10, 1984, which concluded that Jeffcoat's impairments "can limit his comprehension of spoken and written language and also may create problems for him socially and emotionally." Dr. Ray also found Jeffcoat to have a "low average intellect with impaired language ability, an impaired attention span, and a general inability to handle abstract language ideas."

Lisa Renner, a clinical audiologist at the University of Missouri Medical Center, in a letter dated November 15, 1985, noted that audiological testing is done in a sound suite with acoustical tile and thus the test results reflect the patient's hearing under optimum conditions. She believed that Jeffcoat's hearing loss in normal, everyday settings is probably more severe than the tests show and that Jeffcoat would be unable to hear work instructions unless background noise was kept to an absolute minimum and he could see the speaker's face. According to Renner, Jeffcoat's prelingual hearing loss affected both his speech and language development and therefore he has problems with both written and oral instructions and is unable to carry out tasks as assigned. Renner also stated that virtually all hearing-impaired children show increased activity, inattentiveness, a short attention span, an inability to stay on task, and an inability to carry tasks through to completion. These behaviors frequently continue into adulthood.

Dr. Arthur Smith testified at the second hearing as a vocational expert on behalf of the Secretary. In response to a hypothetical question, Dr. Smith stated that "a person with Jeffcoat's deficiencies would be capable of entry-level positions such as mail clerk, mail sorter, payroll clerk, file clerk, cashier, companion, and domestic clerk." Dr. Smith conceded, however, that if Haley's testimony concerning Jeffcoat's inability to stay on task was correct, then Jeffcoat would be unemployable.

**Non-medical Evidence**

Jeffcoat testified at both hearings. At the first hearing in 1984, he stated that he

was attending high school but had problems hearing the teacher while other students were talking. He further stated that he was given additional time to complete tasks and sometimes took three days to finish a test instead of one day. He also testified that he had a difficult time understanding his mother's speech when she was washing dishes and could not understand family conversation at the dinner table when more than one person was talking. He was also unable to understand people speaking on television and could not hear very well on the telephone even with a special attachment.

Jeffcoat also testified about his employment history. He had worked as a laborer during the summer of 1984 but was unable to follow instructions because of noise from cars and airplanes. His employer submitted a letter to the ALJ which indicated that the employer had hired Jeffcoat because he was a friend of Jeffcoat's father. In addition Jeffcoat's brother also worked for this employer and was to closely supervise him. Although the tasks assigned, digging ditches and bringing tools to the other workers, were very simple, Jeffcoat was unable to follow the instructions and was terminated.

Jeffcoat also worked part-time at a Walmart store as a clerk for approximately three months in 1984. He testified that he made mistakes while he worked there because he was unable to follow directions and unable to understand instructions given over the loud speaker.

Jeffcoat's step-mother testified that Jeffcoat was unable to complete household tasks, although he made a sincere and conscientious effort to do so. She stated that he did not understand what was being asked of him, required constant supervision, and usually "messed up."

**Discussion**

The district court concluded, as we do, that a determination of whether Jeffcoat is

disabled turns on whether Haley's testimony that Jeffcoat cannot focus his attention to execute even simple tasks is accepted. Slip op. at 7. The district court properly recognized that the determination of the credibility of witnesses is for the Secretary and not for the court. *Id.* However, the district court failed to discern that the ALJ did not reject Haley's testimony on the basis of a lack of credibility. The ALJ expressly stated that he did not "discount Ms. Haley's opinion." The ALJ concluded, however, that the specialized training program prescribed for Jeffcoat was unnecessary for Jeffcoat to be minimally employable, although the training program would permit him to reach his *optimum* development. *Id.* The ALJ's assessment of Jeffcoat's need for specialized training is directly contrary to Haley's testimony and is not supported by any evidence, medical or non-medical, in the record. Haley testified without qualification that Jeffcoat was unemployable at the present time and would be employable only if he completed the specialized training she proposed. Significantly, even the Secretary's vocational expert admitted that Jeffcoat would be unemployable if Haley's assessment of his deficiencies was correct.

We hold that the ALJ erroneously rejected Haley's testimony. The ALJ did not find Haley's testimony to be incredible and there is no evidence in the record contrary to her assessment of Jeffcoat's deficiencies and his need for specialized technical-vocational training.[2] In addition, certain other factors relied on by the ALJ are either not supported by evidence in the record or are irrelevant to the determination of disability. The ALJ stated that Jeffcoat had "high average intelligence" and an "above average IQ," although his highest average full scale IQ was 93, a slightly *below* normal IQ. The ALJ also stated that Jeffcoat was able to perform "ordinary household tasks generally expected of young men of his age," although the uncontradicted evidence

---

**2.** We hope that Jeffcoat will receive the special technical-vocational training recommended by expert witness Haley. Jeffcoat is a young man, and it would be highly regrettable if a disability that could be overcome through proper training were to prevent him from becoming a productive member of society and keep him on the public welfare rolls for the rest of his life.

established that Jeffcoat did not understand instructions given to him at home, school, or work, required constant supervision, and still was unable to perform or complete simple assigned tasks. The ALJ also relied on the fact that Jeffcoat traveled by himself between Missouri and South Carolina on a regular basis, although Dr. Smith, the vocational expert, testified that this had no bearing on Jeffcoat's employability. We believe that the ALJ also wrongly relied on the following non-medical evidence as outweighing the substantial medical evidence of Jeffcoat's disability: (1) he was able to testify at the hearing, (2) he picked up his younger siblings after school at his natural mother's request, (3) he feeds the family pet and plays football with his brother, and (4) he has no physical limitations other than the hearing loss. These kinds of activity do not reflect real world work capability.

In our view the medical and non-medical evidence summarized above permits only one conclusion. Jeffcoat is disabled and therefore entitled to disability benefits. Accordingly, the judgment of the district court is reversed and the case is remanded with directions that benefits be awarded.